**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFERY M. TREVINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 C 6647 |
| | ) | |
| ANDREW R. WHEELER, Administrator, | ) | Judge Joan H. Lefkow |
| United States Environmental Protection | ) | |
| Agency, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Jeffery Trevino brought this action against Andrew R. Wheeler in his capacity as

Administrator of the United States Environmental Protection Agency (EPA), claiming violations

of Title VII, 42 U.S.C. §§ 2000e *et seq.* (Dkt. 1.)[1] The EPA has moved for summary judgment

on all claims pursuant to Federal Rule of Civil Procedure 56. (Dkt. 25.) For the following

reasons, the motion is granted in part and denied in part.

**FACTUAL BACKGROUND**[2]

Trevino, who is Hispanic and Mexican-American, has been an attorney-advisor at the

EPA's office in Chicago since 1990. (Dkt. 27-2 at 4; dkt. 36-1, ¶ 2.) Throughout his career,

Trevino has handled multiple cases under the Clean Water Act (CWA). (Dkt. 41, ¶¶ 22, 38.)

Many of these cases were resolved through administrative actions, while at least some were

---

[1] The court has jurisdiction over this action under 42 U.S.C § 2000e-5(f)(3), and venue is proper under 28 U.S.C. § 1391.

[2] The facts are taken from the parties' Local Rule 56.1 statements of material facts. Where the parties indicate that a fact is disputed, the court has consulted the record in order to ensure the accuracy of the assertion.

resolved through litigation in federal courts. (*Id.*) One action that Trevino worked on was *United States* v. *Rapanos*, which concerned the interpretation of a rule governing the EPA's regulatory authority over water pollution, sometimes referred to as the "navigable waters" or "waters of the United States" rule. (*Id.* ¶ 27.) The case went all the way to the United States Supreme Court. (*Id.* ¶¶ 30–32.)

Outside of his substantive work, Trevino and another EPA attorney, Nicole Cantello, worked to unionize the EPA's Chicago office. (*Id.* ¶ 10; dkt. 27-8 at 72.) After the union came into effect in 2008, Trevino and Cantello became union stewards, and they would occasionally represent other EPA attorneys in filing union grievances, including complaints of discrimination. (Dkt. 41, ¶ 11; dkt. 27-7 at 70.)

EPA attorneys follow a standard pay scale, with grade scale level 15 (GS-15) being the highest grade and most difficult to achieve. (Dkt. 36-2 at 51–58.) Generally, an EPA attorney must receive a specific promotion in order to obtain GS-15 status. (Dkt. 27-8 at 131.) Trevino was and is at GS-14, the second highest grade. (*Id.* at 132.)

In 2016, the EPA's Office of Regional Counsel (ORC) for Region 5, which included the Chicago office, announced two new GS-15 positions for EPA attorneys. (Dkt. 37, ¶ 14.) The positions were designated as "Senior Counsel for Water Enforcement" and "Senior Counsel for Air Enforcement." (*Id.*) The job announcement indicated that these positions would focus on enforcing the CWA and the Clean Air Act (CAA), respectively, but also stated that expertise in either statute was not required. (Dkt. 27-1 at 2.)

The application process involved three stages. First, applicants submitted a written application consisting of a resume and statement of interest for one or both of the positions to a screening panel. (Dkt. 37, ¶ 16.) Second, the screening panel reviewed the applications and

determined which applicants should receive interviews. (*Id.*) Third, a selecting panel interviewed

the candidates, asking them each the same questions in the same order, and evaluated the

interview responses. (*Id.*) The selecting panel consisted of Regional Counsel Rett Nelson,

Branch Chief Bert Frey, Branch Chief Jane Lupton, and Deputy Division Director Mike Harris.

(Dkt. 37, ¶ 20.) As Regional Counsel, Nelson made the ultimate decision. (*Id.* ¶ 34.)

Trevino and twelve other EPA attorneys submitted applications to the screening panel.

(*Id.* ¶ 17.) Trevino focused his application on the Senior Counsel for Water Enforcement position

based on his background in CWA work. (Dkt. 36-7 at 2.) Trevino's written application consisted

of a one-page statement of interest and a two-page resume. (Dkt. 27-2.) Trevino's application

listed numerous successful administrative actions, but the only federal court case listed was

*Rapanos*. (*Id.*) Neither Trevino's resume nor his statement of interest described his specific

contributions to *Rapanos* or his administrative actions, but instead simply listed the outcomes of

each (*e.g.*, "Board held that the term 'owner or operator' must be interpreted broadly to include

the consultant or designer of an asbestos operation'" (dkt. 27-2 at 3)). The application noted that

Trevino has been designated as a CWA Expert, an Administrative Hearing and Litigation Expert,

and a "Waters of the U.S. Rule" Contact. (*Id.*) It also listed his annual performance ratings of

"Outstanding" or "Exceeds Expectations" and several awards he received. (*Id.*)

Another applicant for the Senior Counsel positions was Deborah Carlson. Carlson had

been an EPA attorney since 1989. (Dkt. 27-3 at 6.) Carlson never worked on a case that went to

the United States Supreme Court and was not designated as an expert in CWA jurisdiction (*id.* at

2–4), but she had other relevant experience. Her written application described in detail her work

on several litigation matters under the CWA and CAA, including her specific contributions to

each matter (*e.g.*, "developing and analyzing the technical and legal bases for the alleged

violations[,] … writing complicated legal memoranda, talking point and consent decree language[,] and participating in difficult consent decree negotiations" (*id.* at 2)). Carlson was also designated as an expert in CWA "General Enforcement" and "Overflow Matters" (cases involving certain sewer systems prone to overflowing due to heavy precipitation). (*Id.* at 2.)

The screening panel decided that all thirteen applicants, including Trevino and Carlson, should receive interviews. (Dkt. 37, ¶ 18.) As in his written application, Trevino's interview focused on his involvement in *Rapanos* (dkt. 27-4), but some panel members maintained that they were uncertain of his contributions to the case despite it having taken up most of his time for several years. (Dkt. 27-7 at 15; dkt. 36-1, ¶¶ 59–63.)

In Carlson's interview, she described working on two cases that went to the Seventh Circuit, which had also been noted in her written application. (Dkt. 27-4 at 14.) One involved a consent decree that incorporated a novel plan for "green infrastructure," which helps to mitigate flooding and pollution in cities. (Dkt. 27-3 at 2.) The other was a collection action to enforce a judgment against a polluter. (*Id.* at 3.) She did not describe any administrative actions.

After the interviews were over, Rett Nelson asked each member of the selecting panel to rank their top three or four candidates and requested that they meet again to compare results. (Dkt. 37, ¶ 22.) Each panelist listed Deborah Carlson among the top three or four candidates; none listed Trevino among their top prospects. (Dkt. 37, ¶¶ 22–23, 30.)

On September 28, 2016, Nelson sent an email announcing that Carlson had been selected as Senior Counsel for Water Enforcement and Counseling. (Dkt. 36-8.) After the announcement, the panel met with Trevino and Cantello, Trevino's fellow union steward, individually to discuss the reasons why Carlson was selected instead of them. Their explanations varied somewhat.

4

At Trevino's meeting, panelists gave the following explanations for selecting Carlson over Trevino:

- Rett Nelson said that the panel was unclear on Trevino's contributions to *Rapanos* because with "bigger cases," it can be difficult to distill exactly what an individual did, and that "lots of people contributed to the result." (Dkt. 36-7 at 4.)

- Later on, Nelson said that Trevino lacked "recent, big cases" in contrast to Carlson. (Dkt. 36-7 at 5.) The only "recent" CWA case identified in Carlson's application was the consent decree described above, which was entered in 2014. (Dkt. 27-3 at 2.)

- Nelson also stated that the panel did not consider *Rapanos* to be a "win" for the EPA based on the plurality's mixed opinion. (Dkt. 36-7 at 4.) It was noted, however, that the defendant polluter in that case did ultimately settle with the EPA. (*Id.*)

- Bert Frey said that Trevino's application did not cover all of the points they were looking for, although he did not say what points Trevino missed. (Dkt. 36-7 at 4.)

- Frey also suggested that *Rapanos*'s poor result caused the agency to take fewer enforcement cases related to wetlands (*id.*), but the rationale behind this assertion and its impact on Trevino's candidacy are unclear.

- Jane Lupton said that Carlson's application more "clearly articulated" her "breadth and depth of knowledge about the CWA." (Dkt. 36-7 at 5.)

At Cantello's meeting, panelists gave the following explanations:

- Nelson said that the panel focused on six criteria: (1) complexity of previous matters; (2) creativity in resolving previous matters; (3) specific contributions to prevailing outcomes; (4) areas of national expertise; (5) skill representing the Region or Agency; and (6) mentoring or training of others. (Dkt. 36-12 at 3.)

- But he also stated that "the folks who were selected did a good job of going through all twelve criteria." (*Id.*) As an aside, no party here has identified what the twelve criteria were, and the job announcement itself does not clearly delineate them. (Dkt. 27-1.)

- When it came to discussing specifically how other candidates were deemed to be more qualified for the roles than Cantello, Nelson stated, "We considered the 'waters of the U.S.' rule" (*id.* at 6), and "whether the person had experience in the area of CWA jurisdiction" (*id.* at 7).

- Lupton added that, despite what Nelson had said previously, they actually had considered all twelve factors. (*Id.*)

- Frey said, "Some of the top candidates had no CWA or CAA experience." (*Id.*) It is unclear how this relates to the twelve criteria mentioned by Nelson and Lupton.

In testimony prepared for this case, the explanations varied somewhat further:

- Nelson clarified that although Cantello and Carlson were the top two candidates for the Senior Counsel for Water Enforcement position, the panel ultimately agreed that Carlson's written application did a better job of highlighting "the depth and breadth of experience that Carlson had with respect to Clean Water Act issues[.]" (Dkt. 27-7 at 113.)

- And despite telling Cantello that the panel considered the candidate's experience with the "navigable waters" rule, Nelson said that the candidate's experience with overflow matters, which Carlson had experience handling, was more important because it made up a greater portion of the EPA's caseload. (Dkt. 27-7 at 119.)

- In a declaration prepared for this case, Lupton similarly stated that "Carlson's written materials and interview demonstrated superlative experience in all areas of Region 5's clean water work." (Dkt. 27-9 at 5.)

According to Trevino, despite the panelist's most recent explanations, they knew that Carlson did not actually have "superlative" experience in CWA matters. At his deposition, Nelson cited Carlson's work on the 2014 consent decree as a significant factor weighing in favor of her selection. (Dkt. 27-7 at 122–23.) But there is some evidence that important components of the consent decree were not Carlson's work but the work of other attorneys that were passed over. Most significantly, the decree's noteworthy "green infrastructure" component was apparently the brainchild of Cantello, whom Lupton asked to help Carlson with the project. (Dkt. 37 at 10–11.)

It is unclear if other panel members knew about this discrepancy or considered their prior knowledge of the applicants in their decision. But Trevino and his then-supervisor, Stephen Mendoza, both claim that ORC managers, including Nelson, have previously stated that they know who they will hire or promote before interviews even begin based on their knowledge of the candidate pool. (Dkt. 36-3 at 80–84; dkt. 41, ¶¶ 4, 41.) Mendoza further states that the EPA's

litigation database demonstrated that Trevino's experience "dwarfed" Carlson's, although the EPA disputes the database's accuracy. (Dkt. 41, ¶ 38.)

Mendoza also believes discriminatory motives were involved in Trevino's non-selection. (Dkt. 36-6.) Mendoza, who is also Mexican-American, states that as a supervisor, he was singled out for different treatment. Specifically, his section of supervisees was filled with "EEO litigants as part of settlements or convenience," and he "had more minority attorneys and union stewards in [his] section than any other in ORC." (Dkt. 36-6 at 7.) Mendoza further elaborates that he "nearly always met resistance from top managers in ORC" when he sought to promote minority employees or union stewards in his section, but his Caucasian employees "sailed through." (*Id.*) He likewise said that he was repeatedly asked to change his ratings of Trevino's performance from "Outstanding" to a lower tier but declined to do so based on the quality of Trevino's work. (Dkt. 36-5 at 641.)

Mendoza has openly complained to Nelson and other members of the selecting panel that he believes they discriminate against minorities in hiring decisions, and he has testified in EEO proceedings against the panel members "at risk of peril to [his] career." (*Id.*) Mendoza also noted a racist remark made by Debra Klassman, who was on the screening panel that reviewed applications. Klassman allegedly said to Mendoza, "Why are you wearing that Russian hat? There aren't any Mexicans in Russia." (Dkt. 36-6 at 7.)

Furthermore, Mendoza stated, "Upper-level non-supervisory GS-15 positions become available in ORC but rarely, if ever, are they filled with minority candidates." (*Id.*) Sometime after the filing of this lawsuit, Mendoza's designation was changed from a supervisory GS-15 position to a non-supervisory GS-15 role. Trevino characterized this as a demotion. (Dkt. 27-8 at 152.) There are only two self-identified Hispanic attorneys at GS-15 level at all, including

Mendoza, and Mendoza is the only Mexican-American GS-15 attorney. (Dkt. 36-5 at 132.)
Trevino and Mendoza both stated that, despite repeated applications by African-Americans,
Mexican-Americans, and Asian-Americans, the EPA had yet to promote anyone from those
groups to available non-supervisory GS-15 roles. (*Id.* at 638; dkt. 27-8 at 65–66.)

Aside from racial discrimination, Trevino and Mendoza both stated that they believe that
individuals on the selecting and screening panels had retaliated against them on other occasions
for supporting employees who had complained of discrimination and unfair treatment in general.
Trevino specifically points to an incident that occurred shortly before the promotion process
began, in which he represented a colleague who filed an EEO complaint of age discrimination
against Nelson and other ORC managers. (Dkt. 41, ¶ 13.) Trevino claims that when he informed
Cohen in January 2015 that he was assisting the employee (referred to as "Grievant J"), Cohen
"repeatedly yelled at Trevino" and accused him of "calling [Cohen] a liar." (*Id.*) Then, in
November 2015, an administrative professional in Nelson's office distributed an EEO affidavit
that Cohen prepared for the case, allegedly by accident. (*Id.* ¶ 14.) On May 30, 2016, Trevino
amended Grievant J's complaint to include a retaliation claim based on the circulation of the
affidavit. (*Id.*) Trevino claims that Nelson "would have been promptly notified of the formal
complaint," but Nelson denies that he was aware of the amended complaint or that Trevino was
assisting the complainant at that time. (Dkt. 27-7 at 87.)

On September 14, 2018, the EEOC ruled that Cohen and Nelson had retaliated against
Grievant J when, albeit inadvertently, Grievant J's confidential EEO information was circulated
to co-workers. (Dkt 36-10.) The EEOC ordered its finding to be posted publicly in the office and
recommended training and disciplinary action against the two officials. (*Id.*)

After the selection of Carlson was announced, Trevino exhausted his administrative

remedies with respect to charges of race, color, and national origin discrimination and of

retaliation related to his union activity. (Dkt. 26 at 8–15.) He then filed this action, raising claims

for unlawful discrimination based on race, color, and national origin, as well as unlawful

retaliation for protected activity under Title VII. (Dkt. 1.)

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact,

entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of

material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary

judgment, the court views the facts in the light most favorable to the non-moving party and

draws all reasonable inferences in his favor. *See Scott* v. *Harris*, 550 U.S. 372, 380 (2007). If the

movant carries its burden of showing that there is no material factual dispute, the non-movant

must then point to a genuine dispute of fact in the record in order to survive summary judgement.

*See Weaver* v. *Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). For discrimination

and retaliation claims, the ultimate question is whether there is sufficient evidence to allow a

reasonable jury to conclude that a prohibited motive was at the root of the adverse action. *See*

*Igasaki* v. *Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021).

## ANALYSIS

Trevino claims that, in failing to promote him to the Senior Counsel position, the EPA

unlawfully discriminated against him under Title VII on the bases of race, color, and national

origin. Trevino further claims that the EPA's failure to promote him was motivated by retaliatory

animus arising from his representation of colleagues who filed EEO charges. The EPA argues

that it is entitled to summary judgment on all of the claims because Trevino lacks any evidence that would allow a reasonable jury to find that its failure to promote Trevino was discriminatory or retaliatory. For the following reasons, the EPA is entitled to summary judgment on Trevino's retaliation claim, but not on his claims for discrimination based on race, color, and national origin.

## I.      Title VII Discrimination Claims

To survive summary judgment on his failure-to-promote claim, Trevino must show that there is sufficient evidence in the record to support the elements of a *prima facie* case: (1) he is a member of a protected class; (2) he was qualified for the promotion; (3) he was rejected; and (4) someone outside of the protected class who was not more qualified than he was hired instead. *See Riley* v. *Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016). The EPA then must present evidence that it had a legitimate, non-discriminatory reason for failing to promote Trevino. *See Atanus* v. *Perry*, 520 F.3d 662, 677 (7th Cir. 2008). If the EPA meets this burden, Trevino must produce evidence that the EPA's reason for not promoting him was pretextual. *See Barnes* v. *Bd. of Tr. Of Univ. of Ill.*, 846 F.3d 384, 390 (7th Cir. 2020). "Because the *prima facie* and pretext inquiry often overlap, if a defendant offers a nondiscriminatory reason for its actions, [courts] can proceed directly to the pretext inquiry." *Id.* Such is the case here. The court therefore turns to the question of whether there is sufficient evidence for a reasonable jury to find that the EPA's justification for promoting Carlson over Trevino was pretextual.

As an initial matter, the parties seem to believe that because this is a failure-to-promote claim, Trevino may only survive summary judgment by establishing that he was objectively the most qualified candidate, and no reasonable person could have chosen Carlson over him. But this high bar applies only where the plaintiff has no other evidence of discrimination besides superior

10

qualifications. *See Joll* v. *Valparaiso Cmty. Schs.*, 953 F.3d 923, 933–34 (7th Cir. 2020). That is

not the situation here. Trevino may support his claim by pointing to circumstantial evidence of

discrimination in one or more of the following categories: (1) suspicious timing, ambiguous

statements, or behavior directed at employees in the protected group; (2) evidence, "whether or

not rigorously statistical," that similarly situated employees received systematically better

treatment; and (3) other evidence that the employer's proffered reason is unbelievable. *Rudin* v.

*Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720–21 (7th Cir. 2005).

There is sufficient evidence in the record on which a reasonable jury could find the

EPA's justification pretextual. To begin, Trevino presents some evidence that falls into the first

two categories regarding the treatment of Mexican-American attorneys compared to similarly

situated White EPA attorneys.[3] Mendoza stated that, as a supervisor, he had no trouble securing

promotions and rewards for his high-performing White employees, while he was constantly met

with resistance from ORC managers while trying to secure the same kinds of promotions and

rewards for his other employees, including Trevino. Similarly, since 1989, only one Hispanic

attorney and no Mexican-American attorneys have been promoted to GS-15 non-supervisory

positions. Moreover, the only Mexican-American attorney occupying such a position at the time

of Trevino's deposition in this case was Mendoza, who, according to Trevino, had actually been

demoted from a supervisory role.

Furthermore, Trevino presents other circumstantial evidence regarding Carlson's

qualifications and the panelists justifications for hiring her. First, Trevino has pointed to the fact

---

[3] Mendoza's declaration also includes evidence of a racist remark made by Klassman, who was on the application screening panel. The remark was made to Mendoza and, while racist and offensive, this type of "stray remark" is generally not sufficient to show that an adverse employment action was motivated by discriminatory animus, particularly where it was not made by the ultimate decision-maker (here, Nelson), and was not clearly connected to the employment decision (the promotion to Senior Counsel). *See Perez* v. *Thorntons, Inc.*, 731 F.3d 699, 709–10 (7th Cir. 2013).

that the consent decree case cited by the panel as a significant factor weighing in Carlson's favor actually received important contributions from Cantello, who was passed over for the role. Even if Nelson was unaware of this fact, Lupton was the one who asked Cantello to help, and she was also the one who repeatedly cited Carlson's "superlative" expertise in all areas of the CWA. Likewise, Carlson's own application clarifies that some of her CWA cases were not on-the-merits litigation but, instead, collection actions, making it unclear how much substantive CWA work she did on those cases.

Second, panelists offered inconsistent and shifting justifications for why Carlson was selected. There was some discrepancy over what or how many factors the panel considered, with Nelson saying that they only focused on six and Lupton saying that they focused on all twelve. And no one has clearly articulated these factors or how they weighed in Carlson's favor.

Nelson further stated that the panel emphasized the candidate's experience with CWA jurisdiction, including their work in the area of the "waters of the U.S." rule, yet there is no evidence that Carlson had expertise in this area, unlike Trevino. Later, Nelson said that this kind of work was actually only a small part of the EPA's docket, and thus not that important after all compared to overflow cases, which Carlson had experience handling. Nelson also said that Trevino lacked recent "big" cases compared to Carlson. Yet he later clarified that because of how big *Rapanos* was, it was actually more difficult to discern how much Trevino had contributed to it, which weighed against him. (Dkt. 36-7 at 3–4.) Moreover, the only "recent" and "big" matter that Carlson listed in her application was the 2014 consent decree, in which she apparently received assistance from Cantello.

The EPA correctly notes that, when assessing an employee's qualifications for a promotion, the court looks to the qualifications sought by the employer, not what the employee

thinks it should have considered *See Robertson* v. *Dept. of Health Servs.*, 949 F.3d 371, 380–81 (7th Cir. 2020). Here, however, it is not entirely clear what qualifications the panel sought or how Carlson satisfied them while Trevino did not. The EPA repeatedly asserts that the panelists were looking for "someone with superlative legal analytic and writing skills" and "broad knowledge" of CWA work, not an "on-your-feet trial attorney" like Trevino. (Dkt. 26 at 10.) But, while the EPA points out in its brief how Carlson's application conforms to this rationale, evidence in the record—specifically the panelists' explanations—does not clearly support it. Instead, the evidence of shifting and inconsistent justifications allows a reasonable inference that the EPA's justification for promoting Carlson was pretextual. *Rudin*, 420 F.3d at 712.

The evidence is by no means overwhelming, but at this stage Trevino need only show a genuine dispute of fact on the question of whether the EPA's failure to promote him was caused by a discriminatory motive. *See Igasaki*, 988 F.3d at 959. Therefore, the EPA's motion for summary judgment is denied as to the race, color, and national origin claims.

## II.    Title VII Retaliation Claim

Even though Trevino's discrimination claim survives, to go forward on his retaliation claim, he must point to evidence in the record showing that the EPA chose not to promote him because of his protected activity. *See Robertson*, 949 F.3d at 378.

Here, Trevino lacks evidence that the EPA failed to promote him because of any alleged protected activity. Trevino's only evidence of EEO activity is an incident where he represented "Grievant J," who filed a claim for age discrimination in January 2015. In March 2016, Grievant J amended her complaint with the EEO to include retaliation after an administrative professional in Nelson's office "leaked" an affidavit that Cohen had prepared for the age discrimination case. Trevino claims that Nelson was promptly made aware that the complaint had been amended to

include a retaliation claim implicating him, but Nelson denies this, and there is no evidence, such as impeaching testimony or notice procedures for such an amendment, that would contradict Nelson. Less than two weeks after the amended EEO complaint was filed, Nelson announced the promotion opportunity. The ultimate decision as to whom to promote, however, was not made or announced until months later, in or around September 2016.

Apart from this incident, Trevino claims that the panel's general awareness of his EEO activity motivated their decision not to promote him, but he cites no specific evidence to support this assertion. Although there is some evidence that Trevino's activity as union steward annoyed or angered Cohen in the past, Trevino must show that his EEO activity alone was a "but for" cause of this specific non-selection. *Univ. of Texas SW Med. Ctr.* v. *Nassar*, 570 U.S. 338, 360 (2013). Thus, the only apparent avenue for the retaliation claim is the temporal proximity between his filing of Grievant J's amended complaint and the non-promotion. But "suspicious timing is rarely enough to create a triable issue" if the adverse actions occur "more than a few days" after the protected activity. *Igasaki*, 988 F.3d at 959 (internal citations omitted). Such is the case here where the available evidence shows that the promotion decision was made months after Trevino amended Grievant J's complaint. As such, the court concludes that Trevino has failed to demonstrate a triable issue of fact that his EEO activity motivated the EPA's failure to promote him. Therefore, Trevino's retaliation claim cannot survive summary judgment.[4]

## **CONCLUSION AND ORDER**

The EPA's motion for summary judgment (dkt. 25) is granted as to Trevino's retaliation claim (Count I) and denied as to Trevino's race, color, and national origin discrimination claims

---

[4] As the EPA points out, the relevant statute for Trevino's retaliation claim is the Age Discrimination in Employment Act, see 29 U.S.C. § 623(d), rather than Title VII. The court has not rested on this deficiency since the facts and issue are clear and Rule 15(b) might allow late amendment of the pleadings to correct this inaccuracy.

(Counts II, III, and IV). The case is set for status on 09/27/2022. In the meantime, the parties are directed to engage in serious discussion concerning whether this case can be resolved without further litigation.

Date: August 24, 2022

_____
U.S. District Judge Joan H. Lefkow